# AFFIDAVIT

I, DEA Task Force Officer Samuel Mosca, being duly sworn, depose and say the following:

1. I have been a police officer for approximately 23 years. I currently work for the City of Youngstown Police Department, where I have been employed for approximately 21 years. Before that, I was a police officer with the Mill Creek Metro-Parks Police Departments. I have been assigned to the Drug Enforcement Administration, Detroit Field Division, Youngstown Resident Office, since October 8, 2012. During this time, I have been assigned investigative responsibilities in the area of drug law violations.

2. I have been involved in numerous narcotics-related arrests, have executed search warrants, seized narcotics or dangerous drugs. I have supervised the activities of numerous informants and cooperating witnesses who have provided information and assistance resulting in drug buys, searches, arrests and convictions. Based on the above experience, I am familiar with the *modus operandi* of persons involved in the illicit distribution of controlled substances, as well as the terminology used by persons involved in the illicit distribution of controlled substances. I am aware that persons involved in the illicit distribution of controlled substances nearly always attempt to conceal their identities and the locations at which drug transactions take place. I know that individuals engaged in organized drug distribution and sales often maintain records of those sales and also maintain extensive contacts with persons from whom they receive drugs and to whom they distribute drugs. It is likewise essential that such organized groups meet to formulate plans concerning narcotics or other illegal activities, and to divide their illegal proceeds.

3. I have assisted and led drug and other criminal investigations within the jurisdiction of the City of Youngstown, Ohio and the County of Mahoning, Ohio. I have also received training in the identification of narcotics, search and seizure issues, and preparing search warrants. I have had experience in surveillance techniques, investigating narcotic and criminal cases, including the preparation and execution of narcotic and other criminal case search warrants and debriefing of defendants, witnesses, cooperating sources and other persons who have personal knowledge of narcotics and criminal violations. I have been involved in narcotic related arrests and executed search warrants, which resulted in the seizure of narcotics, and supervised the activities of informants who have provided information and assistance resulting in narcotic purchases. I have questioned suspects, debriefed informants and have conferred with other officers and prosecuting attorneys, and as a result have gained experience in investigating drug trafficking organizations.

4. On a regular basis, I review law enforcement bulletins and intelligence reports regarding narcotic trafficking and smuggling, and remain in communication with counterparts in order to keep up to date with modern techniques and trends used by narcotic traffickers in the domestic and international arena.

5. Based upon my training, experience and discussions with other Special Agents and law enforcement officers concerning the distribution of controlled substances, I know:

    a) That drug traffickers very often place assets in names other than their own to avoid detection of these assets by government agencies;

    b) That drug traffickers very often place assets in corporate entities in order to avoid detection of these assets by government agencies;

c) That even though these assets are in other person's names, the drug dealers actually own and continue to use these assets and exercise dominion and control over them;

d) That drug traffickers often place drugs and assets in hidden locations, known as "safe houses", to protect and conceal the location from government agencies, thereby avoiding conducting transactions at these places but often times in very close proximity to these locations;

e) That large-scale narcotic traffickers usually maintain on hand large amounts of U.S. currency in order to maintain and finance their ongoing narcotics business;

f) That narcotic traffickers maintain books, records, receipts, ledgers, airline tickets, and money orders to assist in the distribution of controlled substances. Narcotic traffickers usually provide narcotics on consignment to their associates and maintain records through receipts, notes, and ledgers that are easily accessible to the traffickers;

g) That it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residence and/or business for their ready access and concealment from law enforcement authorities;

h) That persons involved in large-scale drug trafficking conceal in their residence and businesses caches of drugs, large amounts of currency, financial instructions, precious metals, jewelry, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining transferring, secreting, or the spending of large sums of money made from engaging in narcotic trafficking activities;

i) That when drug traffickers amass large proceeds from the sale of drugs they attempt to legitimize these profits. To accomplish these goals, drug traffickers utilize domestic banks and their attendant services, securities, safe deposit boxes, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, and business fronts;

j) That drug traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization;

k) That drug traffickers take or cause to be taken photographs of them, their associates, their property, and their product. That these traffickers usually maintain these photographs in their possession;

l) That I am aware that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

m) That drug traffickers commonly use automobiles to store and transport narcotics and proceeds from selling narcotics.

## CRIMINAL ACTIVITY DETAILED

6. Investigators have received information concerning narcotic trafficking activities of Kewan CLARK from an undisclosed cooperating source (hereinafter referred to as CS-1). CS-1 has furnished information to the DEA Youngstown Resident Office since January 2018, and attempted to conduct controlled purchases of narcotics. CS-1 has a drug-related criminal history. CS-1 cooperated in exchange for monetary compensation and has received monetary compensation for expenses, information, or assistance. I believe CS-1's information is reliable because CS-1's information has been consistently corroborated by independent investigation by the DEA and FBI, corroborated by other confidential sources, corroborated by other witnesses, and corroborated by other information provided to DEA. To my knowledge, CS-1 has never provided information that was deliberately false or misleading. The information and/or assistance provided by CS-1 has led to one arrest and one search warrant including seizures of narcotics.

7. CS-1 said that Kewan CLARK is a drug trafficker in the Youngstown, Ohio area. Specifically, CS-1 said that CLARK distributes large quantities of cocaine. In August, 2018, CS-1 attempted to conduct a controlled purchase of cocaine from CLARK. However, CLARK indicated that he did not want to sell cocaine directly to CS-1. Instead, he suggested introducing CS-1 to another individual. The controlled purchase never took place.

8. Investigators have also received information concerning narcotic trafficking activities of Kewan CLARK and Harold RAMBERT from an undisclosed source of information, (hereinafter referred to as SOI-1). SOI-1 has furnished information to the DEA Youngstown Resident Office since August 2018. SOI-1 has a property crime and drug related criminal history. SOI-1 cooperated in exchange for judicial consideration. I believe SOI-1 information is reliable because SOI-1's information has been consistently corroborated by independent investigation by the DEA, corroborated by other confidential sources, corroborated by other witnesses, and corroborated by other information provided to DEA. To my knowledge, SOI-1 has never provided information that was deliberately false or misleading. The information and/or assistance provided by SOI-1 has led to one arrest and one search warrant, including seizures of narcotics and narcotics proceeds.

9. SOI-1 identified Kewan CLARK as a drug trafficker in the Youngstown, Ohio area. SOI-1 said that CLARK sells large quantities of cocaine. He said that CLARK gets his drugs from unknown sources in Texas and uses a driver to transport the drugs back to Ohio in a car with a hidden compartment.

10. Investigators have also received information concerning narcotic trafficking activities of Kewan CLARK and Harold RAMBERT from an undisclosed source of information, (hereinafter referred to as SOI-2). SOI-2 furnished information to the DEA Youngstown Resident Office since August 2018. SOI-2 has a drug related criminal history. SOI-2 cooperated in exchange for judicial consideration. I believe SOI-2's information is reliable because SOI-2's information has been consistently corroborated by independent investigation by the DEA, corroborated by other confidential sources,

corroborated by other witnesses, and corroborated by other information provided to DEA. To my knowledge, SOI-2 has never provided information that was deliberately false or misleading. The information and/or assistance provided by SOI-2 has led to one arrest and one search warrant, including seizures of narcotics and narcotics proceeds.

11. SOI-2 identified Kewan CLARK as a drug trafficker in the Youngstown, Ohio area. SOI-2 said that CLARK sells large quantities of cocaine. He said that CLARK gets his drugs from unknown sources in Texas and uses a driver to transport the drugs back to Ohio in a car with a hidden compartment.

12. In August 2018, a Source of Information (SOI-1) provided DEA narcotics trafficking activities of Harold RAMBERT. According to the SOI, an individual named "Harold," Also Known As (AKA) "Pops," is a driver or courier for a Drug Trafficking Organization (DTO) in the Youngstown, Ohio area. The SOI stated Harold, who was later identified as Harold RAMBERT by the SOI via RAMBERT's state of Ohio driver's license, would drive a dark colored Dodge Caliber from Youngstown, Ohio to an unidentified location in Texas approximately twice a month in order to pick up between ten (10) and fifteen (15) kilograms of cocaine hydrochloride (HCL). The SOI went onto explain that RAMBERT would then drive the kilograms of cocaine back to Ohio concealed in an aftermarket hidden compartment in the dark colored Dodge Caliber. According to the SOI, RAMBERT previously utilized an orange Dodge Caliber, which was also equipped with an aftermarket hidden compartment.

13. A check of the Ohio Law Enforcement Gateway (OHLEG) by DEA SA Fraser revealed RAMBERT has a dark blue 2007 Dodge Caliber, bearing Ohio license plate 493YWD, registered at 138 Lilburne Dr., Youngstown, Ohio 44505.

RAMBERT also has a copper 2008 Dodge Caliber, bearing Ohio license plate FXL8939, registered to 138 Lilburne Dr., Youngstown, Ohio 44505.

14. A check of the DEA License Plate Reader (LPR) database by SA Fraser revealed on July 17, 2018, August 1, 2018, August 14, 2018, August 15, 2018, and October 15, 2018, RAMBERT's dark blue 2007 Dodge Caliber, bearing Ohio license plate 493YWD, was observed travelling on roadways in Texas. The LPR database provided photographic evidence of the vehicle being in Texas.

15. A check of the DEA LPR database by SA Fraser also revealed on October 7, 2018, RAMBERT's copper 2008 Dodge caliber, bearing Ohio license plate FXL8939, was observed travelling on roadways in Texas. The LPR database provided photographic evidence of the vehicle being in Texas.

16. During the week of October 8, 2018, the SOI contacted SA Fraser and informed SA Fraser that the SOI believed RAMBERT was scheduled to travel from Youngstown, Ohio to an unidentified location in Texas in the dark blue 2007 Dodge Caliber the next week (week of October 15, 2018.)

17. On October 11, 2018, while reviewing video from the covert fixed electronic video surveillance of RAMBERT's residence at 138 Lilburne Dr., Youngstown, Ohio 44505, officers observed a dark colored Dodge Caliber pull into the residence at approximately 7:39 PM. This is the first time members of the Youngstown Resident Office (YRO) have observed this vehicle at the residence since the installation of the covert fixed electronic video surveillance on September 14, 2018.

18. At approximately 9:30 PM, same date, SA Fraser and TFO Sam Mosca established physical surveillance at 138 Lilburne Dr., Youngstown, Ohio 44505.

TFO Mosca and SA Fraser observed RAMBERT's dark blue Dodge Caliber parked off to the side of the driveway at the residence.

19. On October 15, 2018, at approximately 10:23 A.M., the DEA License Plate Reader database notified your affiant that Harold RAMBERT's Dodge Caliber was located on Interstate 10, in Beaumont, Texas.

20. On October 15, 2018, U.S. Magistrate Judge George J. Limbert authorized a search warrant for precise cellular telephone location data (GPS pings) for cellular phone number 330-559-3443, subscribed to and used by Harold RAMBERT, with a service provider of AT&T. Monitoring began at approximately 6:50 P.M. when agents received their first GPS ping showing Harold RAMBERT's phone at the Palace Inn hotel located at 2027 S. Wayside Drive, Houston, Texas.

21. On October 16, 2018, S/A Fraser contacted DEA Houston FD, S/A Brad Sowell reference assistance with physical surveillance in effort to monitor the activity of Harold RAMBERT during his stay in Texas. At approximately 4:00 P.M., S/A Sowell advised that he spotted RAMPART's Dodge Caliber in the parking lot of the Palace Inn hotel.

22. On October 17, 2018, at approximately 9:00 A.M., Agent Sowell advised that he observed Harold RAMBERT exit the Hotel and get into his Dodge Caliber. At this time, S/A Sowell and other DEA Houston agents followed RAMBERT as he departed from the area. During the surveillance, agents report that RAMBERT stopped at several retail and second hand stores, including the Dollar Tree, a thrift store at Griggs Street and Cullen Avenue, and a thrift store at Polk Avenue and Wayside Avenue, all in the Houston, Texas area. Agents further advised that RAMBERT was observed buying a green suitcase at the

thrift store at Griggs Street and Cullen Avenue. During RAMBERT's time away from his room, S/A Fraser noted that the target's cell phone was still pinging at the Palace Inn Hotel. Furthermore, S/A Sowell advised that he observed Harold RAMBERT talking on another cell phone during the surveillance, indicating that RAMBERT has a second cellular phone.

23. During the morning of October 18, 2018 S/A Sowell continued surveillance of RAMBERT with no significant activity to report. Later in the afternoon, S/A Sowell observed Harold RAMBERT driving around the area of a small, Houston area airport, known to be used for shipping cargo. Later that evening, at approximately 9:30 P.M., S/A Fraser received a GPS ping showing Harold RAMBERT's cell phone at a condominium located at 1412 Rosewood Street, Houston, Texas.

24. On October 19, 2018, at approximately 11:45 A.M., a GPS ping showed Harold RAMBERT at George Bush International Airport located at 2800 N. Terminal Rd., Houston, Texas. After approximately one hour of RAMBERT's phone continually pinging at the George Bush International Airport, agents determined that RAMBERT was in the process of boarding a flight out of Houston to an unknown destination. At approximately 5:15 P.M., Agents began receiving GPS pings showing RAMBERT's phone at Fort Lauderdale-Hollywood International Airport. Later at 8:15 P.M., Agents learned via GPS pings that RAMBERT took a flight from Fort Lauderdale-Hollywood International Airport to Pittsburgh International Airport.

25. On October 20, 2018, at approximately 7:00 A.M., GPS pings showed Harold RAMBERT at the Greyhound Bus Station in Pittsburgh, Pennsylvania, located at 55 11th Street, Pittsburgh P.A. Later that morning, subsequent GPS pings indicated that

RAMBERT travelled from Pittsburgh to the Greyhound Bus Station in Youngstown, Ohio. Later that evening while monitoring the fixed surveillance device in the area of 138 Lilburne Avenue, Youngstown, Ohio, TFO Klingensmith observed Harold RAMBERT at his Lilburne address.

26. In the evening of October 22, 2018, agents monitoring the GPS pings noticed that RAMBERT was at the Greyhound bus station in Akron, Ohio. While reviewing subsequent pings, it was determined that RAMBERT was most likely travelling on a Greyhound bus. Your affiant pulled the itinerary for Greyhound trips from Akron, Ohio to Houston Texas. RAMBERT's pings followed the same route as the itinerary.

27. On October 24, 2018 RAMBERT's pings showed him back at the same hotel where he previously stayed in Houston, Texas. On October 26, 2018 the GPS pings showed RAMBERT had departed the Houston area was traveling back north.

28. During the late evening on October 27, 2018 agents from the DEA Youngstown Task Force established surveillance on Interstate 71 from Columbus, Ohio to Akron, Ohio in attempt to locate RAMBERT on his way back to the Youngstown, Ohio area. During the surveillance, DEA Youngstown Task Force agents spotted RAMBERT driving his Dodge Caliber north bound on Interstate 71 in Columbus, Ohio. DEA Youngstown Task Force agents subsequently followed the Dodge Caliber from Columbus, Ohio.

29. DEA later set up surveillance at Kewan Clark's house, located at 3210 Glen Oaks Drive, Youngstown, Ohio. At approximately 6:40 a.m., surveillance units saw RAMBERT's Dodge Caliber arrive at CLARK's house and pull into the attached garage.

30. Shortly thereafter, investigators executed a search warrant at CLARK's house authorized by Mahoning County Common Pleas Court Judge Durkin. CLARK and RAMBERT were both in the house. Inside, officers found the following items:

   a. Three kilo wrappers;

   b. Red plastic cup with residue;

   c. Digital scale;

   d. Over $3,000 U.S. currency;

   e. Loaded Glock pistol;

   f. Money counter

   g. Loaded Springfield Armory pistol;

   h. Loaded Bear Firearms pistol;

   i. Plastic bags with suspected marijuana, cocaine, and heroin;

   j. Plastic bag containing multiple baggies with white and brown substances;

   k. High Standard firearm;

   l. Ballistic vest;

   m. Large plastic bag with a substance that looks like heron and two glass vials with liquid;

   n. Herstal pistol;

   o. Foodsaver vacuum sealer;

   p. In the garage, SA Fraser found six wrapped packages that appeared to be six kilograms of cocaine. In fact, the packages contained sham cocaine. Based on my training and experience, I know that six kilograms of cocaine would have been consistent with redistribution and not personal use.

q. Agents also inspected RAMBERT's vehicle and saw that it contained an after-market hidden compartment.

31. Based on the above, there is probable cause to believe that CLARK has violated 21 U.S.C. § 846, that is, conspiracy to distribute controlled substances.

TFO Samuel Mosca

Sworn to and subscribed in my presence this 29 day of October, 2018.

George J. Limbert
U.S. Magistrate Judge